William Chelius and Mary Chelius (Wife) v. Commissioner.
Chelius v. Commissioner
Docket No. 65057.
United States Tax Court
T.C. Memo 1958-29; 1958 Tax Ct. Memo LEXIS 203; 17 T.C.M. (CCH) 121; T.C.M. (RIA) 58029; February 25, 1958
*203 Raymond T. Hyer, Esq., 79 Main Street, Port Washington, N.Y., and Philip E. Smith, Esq., for the petitioners. Emil Sebetic, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax of $22,159.02 for the year 1953 and an addition to tax of $1,628.57 under section 294(d)(2), Internal Revenue Code of 1939. The issue with respect to the addition to tax has been conceded by the Commissioner and the only question for decision is whether petitioner Mary Chelius is properly taxable on the entire proceeds of an undivided onehalf interest in a winning ticket in the Irish Sweepstakes. Findings of Fact Some of the facts have been stipulated, are found as stipulated, and the stipulation of facts together with the pertinent exhibits are included herein by this reference. Petitioners are husband and wife, residing at East Rockaway, Long Island, New York. They filed a joint income tax return for the year 1953 with the district director of internal revenue for the Brooklyn District of New York. During the early part of 1953, tickets were being sold by the Hospital Trust (1940) Ltd. *204 , Ballsbrudge, Dublin, Ireland, for an Irish Hospitals' Sweepstake lottery based on the English Derby to be run at Epsom, England on June 6, 1953. The tickets come in books of 12 each. Each ticket is in 2 parts, namely, the ticket stub and the ticket receipt. The ticket stub contains the number of the ticket, name and address of the purchaser, and name and address of the seller. The ticket receipt, which is separated from the ticket stub by a perforation, contains the number of the ticket and is imprinted on a specially watermarked paper. A purchaser of a ticket fills out the ticket stub portion and receives and keeps the ticket receipt portion. The seller of the ticket forwards all the ticket stubs to Ireland, and at a later date receives an official receipt on similar specially watermarked paper, but bearing a serial number different from that on the purchaser's original ticket receipt, to indicate that the stub of the original ticket has been received and placed in a pool and is part of the official drawing. The number of pools participating depends on the total monies collected by the sweepstake trustees. Each sweepstake is based on a separate running of an English Derby, generally *205 held about 3 times each year, usually March, June and September. Approximately 10 days prior to the Derby the sweepstake winners are drawn for each pool. Some of the drawn tickets are assigned horses in the race, and others are given cash consolation prizes. The holders of each ticket, to which a horse in the Derby is assigned, is assured of a consolation prize. The holder of the ticket of the winning horse receives the first prize of 50,000 English pounds equivalent to $140,000. The Division of each Pool's prize unit of 120,000 English pounds is as follows: Division of Each Unit of 120,000 Pounds Sterling
Pounds
Sterling
First horse
50,000
Second horse
20,000
Third horse
10,000
31 other horses drawn, whether run-
ners or not, 548 pounds 8 shillings
0 pence each
17,000
200 Cash prizes of 100 pounds each
20,000
300 Consolation prizes of 10 pounds
each
3,000
120,000 The prize fund is divided into as many untis of 120,000 pounds sterling each as the total permits, and the residue is divided into 50 residual prizes. During 1953 and for sometime previous petitioner Mary Chelius and Norman Enders were employed by Mary Ellen Clancy who operated *206 a mail order house at 250 Park Avenue, New York, New York. During April of 1953, Mary and Enders each purchased a half interest in a 1 pound ( $3) ticket No. VC 54031, for $1.50 each, in the June 1953 Irish Hospitals' Sweepstake from John O'Neil of Brooklyn, New York. The true names of the purchasers, Mary Chelius and Norman Enders, were not recorded on and do not appear on the ticket stub. Instead they purchased and registered the ticket under the nom de plume "Clancyites", 250 Park Avenue, New York. The ticket stub was then sent to Ireland to participate in the drawing of the winning ticket. In using the term "Clancyites" Mary intended to include her husband and 2 minor children as owners of an undivided interest in her share of the ticket. Only one receipt evidencing the purchase of the ticket was given. This receipt was kept at all times material herein in the possession and control of Enders. At the time Mary and Enders purchased the ticket, Mary said nothing to Enders to indicate that she was not the sole owner of her interest therein or that she intended to make the purchase on behalf of her family. Neither did Mary know at that time what the law might require for passing *207 title to her interest in the ticket, either for acquiring such interest as a joint interest with others, making a gift of part of her interest or for putting into effect any intention she might have with respect to such interest. In purchasing the ticket it was Mary's intention that her family was sharing, share and share alike with her in the ticket and whatever winnings might result. Mary's family consisted of herself, her husband and 2 minor children, Patricia and William. When she came home from work on the day the ticket was bought she mentioned to the family at supper time that she "had bought us" a Sweepstake ticket and kidded about "us getting rich or something." She also told other friends that the whole family had an interest in the ticket. On June 1, 1953, the results of the drawing were released and ticket No. VC 54031 was announced as having been one of the tickets drawn to which the horse Pinza was assigned for the Derby. Official notice of the drawing results for ticket No. VC 54031 was sent c/o John O'Neil. After the ticket was drawn Mary had a conversation with her cousin's husband, Raymond T. Hyer, a lawyer. He discussed with her some of the questions which *208 might be involved under the tax laws in proving that her family had an interest in the ticket. At his suggestion the following affidavit was prepared and executed under oath by Mary: "June 3, 1953 "I, Mary Chelius, being sworn, deposes and says I reside at 43-05 61st Street, Woodside, Long Island, New York, that I purchased jointly with Norman Enders a sweepstake ticket #VC 54031 in the Irish Sweepstakes under the non de plume 'Clancyites'. At the time of purchase I told my husband William and my son William George and my daughter Patricia Ann that they would participate equally if the ticket was drawn. On June 1, I learned that the ticket was drawn and was assigned a horse 'Pinza'. I called my cousin to tell her and to ask her husband Raymond T. Hyer for advice. I told him of the aforesaid and he advised me that I draw this affidavit to have written evidence of my intention. He further advised me that any sums received would be considered mine unless I agreed to put the monies of the minor children in the hands of a Trustee, to be used exclusively for their benefit. I discussed the matter with my husband who agreed that since the children's share was to be their own anything that *209 had to be done to insure this result should be done. I therefore asked Mr. Hyer to handle the various legal problems and he therefore prepared this affidavit and agreed to prepare such instruments as would be necessary." Also, shortly after the ticket was drawn and assigned the horse Pinza, Mary and Enders rented a safe deposit box and placed therein the ticket receipt. Each paid half of the $5 rental for the box. Only Enders had access to the box. It is stipulated that during the period commencing immediately after the sweepstake drawing on June 1, 1953, up to the running of the Derby on June 6, 1953, the fair market value of ticket No. VC 54031 was $25,000. Accordingly, during such period, a one-fourth interest therein had a fair market value of $6,250. On June 6, 1953, the English Derby was run at Epsom, England, and was won by Pinza, thereby making ticket No. VC 54031 a first place winner in the June Irish Hospitals' Sweepstake. No official notice was received during the next few weeks by either Mary or Enders that Pinza had won the race and on June 16, 1953, they wrote the following letter: "June 16, 1953 "Mr. M. Meehan 53 Lr. Dorset St., Dublin, Ireland
"Dear Mr. *210 Meehan: "We are co-owners of ticket No. VC 54031 on Pinza which was confirmed in your cable to John O'Neill of 640 Carroll Street, Brooklyn, New York, U.S.A.
"Would you please advise us individually at our own respective addresses, which appear below, as to the necessary procedure for accepting delivery of the award. "We are sure that you will appreciate our anxiousness to hear from you as quickly as possible since, although we hold the ticket and are the owners of same, we have had no communication whatsoever from anyone." "(Signed) (Mrs.) Mary Chelius, Mary Chelius Address: 4305 - 61st Street Woodside, Long Island, New York "(Signed) Norman Enders, Norman Enders Address: 75-22 - 61st Street Glendale 27, Long Island, New York
"P.S. The ticket was written in the name of THE CLANCYITES, 250 Park Avenue, New York, which is where we work." The name of the addressee of the foregoing letter was obtained from the notice received by O'Neil advising the ticket purchased by Mary and Enders had been assigned the horse Pinza. Under date of June 23, 1953, the Hospital Trust, Ltd. sent instructions with respect to collection of the proceeds of ticket No. VC 54031 addressed *211 to "Clancyites", 250 Park Avenue, in care of John O'Neil, 640 Carroll Street, Brooklyn, New York. This instruction letter was then transferred by O'Neil to Mary and Enders. After the race had been run and ticket No. VC 54031 became entitled to the first prize of approximately $140,000, Hyer drafted separate trust agreements for the benefit of the Chelius children and, under date of July 1, 1953, Mary executed the separate trust agreements for the benefit of her children. At the time she executed the trust agreements she was familiar with the contents thereof. The agreements are substantially identical except for the names of the beneficiaries and provide in part as follows: "AGREEMENT made the first day of July, 1953, between Mary Chelius residing at 4305 61st Street, Woodside, New York as 'Donor' and Raymond T. Hyer, attorney, with offices at 79 Main Street, Port Washington, New York as 'Trustee'. "Whereas the Donor desires to create a trust of the property and for the purposes and subject to the provisions hereinafter set forth and the Trustee is willing to accept such trust upon the terms and conditions hereinafter provided. "Now therefore, this agreement Witnesseth, that, *212 in consideration of the premises the Donor has granted, conveyed, assigned, set over and delivered and by these presents does grant, convey, assign, set over and deliver unto the Trustee, his successors and assigns, the following property pursuant to a previous agreement. A twenty-five (25%) interest in my portion of a sweepstake ticket #VC 54031 which was drawn and assigned a horse named 'Pinza' in the English Derby, June 6, 1953 and which received first prize." To expedite collection of the proceeds of the ticket Mary, her husband, Hyer, and Enders retained Henry W. Schober, an attorney, to act as their agent for the purpose of collecting the proceeds. On July 10, 1953, the parties executed an escrow agreement concerning the collection of the ticket proceeds which contains the following recitations: "WHEREAS, upon the issuance of said ticket aforementioned, the nom de plume 'Clancyites' was used by the parties of the first [petitioner Mary Chelius] and fourth [Norman Enders] parts, and "WHEREAS, the party of the third part [Raymond Hyer] by Deed of Trust was designated by the party of the first part as trustee for Patricia Ann Chelius and William George Chelius, which *213 said deed of trust was dated the 1st day of July 1953 and by which said deed of trust, the share of said party of the third part in the undivided one-half interest in and to said ticket as hereinabove mentioned was established and credited, and * * *" Enders first became aware of the fact that the members of the Chelius family were to share in the proceeds of ticket No. VC 54031 at or about the time the escrow agreement dated July 10, 1953 was drafted and executed. On July 10, 1953, Schober wrote to T. Kyne, one of the sweepstake trustees, transmitting a form of authority and original ticket foil to expedite collection of the ticket proceeds. On July 22, 1953, Kyne replied to Schober inquiring why Hyer signed as trustee, and making inquiry concerning other possible interests. On July 30, 1953, Schober transmitted to Kyne copies of the trust agreement by virtue of which Hyer was acting as trustee. On August 19, 1953, Kyne wrote to Schober calling attention to the fact that the ownership of ticket No. VC 54031 as set forth in the form of authority previously submitted was inconsistent with the letter dated June 16, 1953, in which Mary and Enders had advised that they were the *214 co-owners of such ticket, and requesting clarification with respect thereto. On August 28, 1953, Schober replied to Kyne concerning the apparent conflict of ownership of the ticket in a letter which provides in part as follows: "Mrs. Mary Chelius and Mr. Norman Enders were the original purchasers of the ticket, but as you will have observed by the Trust Agreement, Mrs. Chelius transferred a portion of her interest to Mr. Raymont T. Hyer as Trustee for her children. * * *" Thereafter, Schober made collection of the proceeds of ticket No. VC 54031 which were distributed and received by the various parties as follows: Petitioners William
and Mary Chelius
$34,875.00
Raymond T. Hyer, Trustee
34,875.00
Petitioners reported among other items of income on their 1953 return the $34,875 which they received from the proceeds of the ticket. They did not report the amount received by Hyer as trustee. In determining the deficiency involved herein the Commissioner included in income of petitioners the amount of $34,875 received by Hyer as trustee. Opinion We treat the issue as a mixed question of law and fact. Viewing the record as a whole we think it was clear *215 that from the time of purchase Mary intended and thought that her husband and children had equal interests with her in one-half of the ticket. Perhaps in a technical sense she did not take action which clearly would have effectuated her intention at the time the ticket was purchased. For example, she could have entered the names of her husband and children on the ticket or she might concurrently have executed a deed of gift or done "something in the nature of a symbolic delivery." Cf. Harry J. Riebe, 41 B.T.A. 935, affd. 124 Fed. (2d) 399 (C.A. 6). She did not. But her failure to take unmistakable steps to consummate her intention was due to artlessness and we think it fair to say that the things she did do to carry out her purpose were such as the nature of the transaction and the circumstances and surroundings of the parties reasonably required. See Harry J. Riebe, supra. In the Riebe case, on which the Commissioner strongly relies, we held that the taxpayer, who had purchased the ticket in his own name, was the sole owner of the ticket and that he had made an ineffectual effort to alter that ownership after the ticket was drawn and it *216 became valuable, with the result that he was taxable on the entire winings. Here Mary bought the ticket in a co-ownership with another, using not her own name, but a nom de plume with the intention at the time to include as owners with herself, her husband and children. In these circumstances we think Mary, her husband and the children had a share and share alike ownership in the ticket itself from the time of purchase. From that time on the things that were done were done in furtherance of the original understanding of the parties. This brings the present case more in line with Christian H. Droge, 35 B.T.A. 829 and Samuel L. Huntington, 35 B.T.A. 835, and furnishes an adequate basis for distinguishing the Riebe case. On the facts we hold that at the time Mary and Enders purchased the ticket Mary's husband and the two children became the owners of equal shares in the ticket with her and that the Commissioner erred in taxing the children's winnings to Mary. Decision will be entered under Rule 50.